# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 20-862V**
**Filed: February 26, 2026**

|  |  |
|---|---|
| ARTHUR FRENCH,<br><br>　　　　　　　　Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Special Master Horner |

*Michael G. McLaren, Black, McLaren, Jones, Ryland & Griffee, P.C., Memphis, TN, for petitioner.*
*Tyler King, U.S. Department of Justice, Washington, DC, for respondent.*

## RULING ON ENTITLEMENT[1]

　　On July 15, 2020, petitioner filed a petition under the National Childhood Vaccine Injury Act ("Vaccine Act"), 42 U.S.C. § 300aa-10, *et seq.* (2012).[2]  Petitioner alleged that he suffered either a Table Injury of "SIRVA," *i.e.*, a shoulder injury related to vaccine administration, or a shoulder injury caused-in-fact by his vaccination following receipt of an influenza ("flu") vaccine on October 26, 2019.  (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner is entitled to compensation.

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10, *et seq.*

### I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; suffered a serious or long-standing injury; and has received no previous award or settlement on account of the injury.  Finally – and the key question in most cases under the Program – the petitioner must also establish a causal link between the vaccination and the injury.

In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(i); § 300aa-14(a).

The Vaccine Injury Table lists a Shoulder Injury Related to Vaccine Administration or "SIRVA" as a compensable injury if it occurs within 48 hours of vaccine administration.  § 300aa-14(a), *amended by*, 42 C.F.R. § 100.3.  In this case, however, the Chief Special Master already issued findings of fact and conclusions of law that determined that petitioner cannot meet the specific requirements for demonstrating a Table SIRVA due to preponderant evidence of a preexisting shoulder condition.[3]  (ECF No. 48; 2023 WL 7128178 (Fed. Cl. Spec. Mstr. Sep. 27, 2023).)

Alternatively, if no injury falling within the Table can be shown, the petitioner may still demonstrate entitlement to an award by showing that the vaccine recipient's injury was caused-in-fact by the vaccination in question.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(ii).  To so demonstrate, a petitioner must show that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury."  *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53

---

[3] Table Injury cases are guided by statutory "Qualifications and aids in interpretation" ("QAIs"), which provide a more detailed explanation of what should be considered when determining whether a petitioner has suffered an injury listed on the Vaccine Injury Table.  42 C.F.R. § 100.3(c).  To be considered a "Table SIRVA," petitioner must demonstrate the following: (i) there is "[n]o history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection"; (ii) that "[p]ain occurs within the specified time-frame," *i.e.* within 48 hours of vaccination; (iii) that the "[p]ain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered"; and (iv) that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)."  42 C.F.R. § 100.3(c)(10).

(Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006).  In particular, a petitioner must show by preponderant evidence: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen v. Sec'y of Health & Human Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005).

A petitioner may also allege that a vaccine caused a "significant aggravation" of a pre-existing condition.  The Vaccine Act defines a significant aggravation as any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health.  § 300aa-33(4). Where a petitioner in an off-Table case is seeking to prove that a vaccination aggravated a pre-existing injury, petitioners must also address three *additional* factors beyond the three-part *Althen* test.  *See Loving v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 135, 144 (Fed. Cl. 2009) (combining the first three *Whitecotton* factors for claims regarding aggravation of a Table injury with the three *Althen* factors for off-Table injury claims to create a six-part test for off-Table aggravation claims); *see also W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013) (applying the six-part *Loving* test.).  The additional *Loving* factors require petitioners to demonstrate aggravation by showing: (1) the vaccinee's condition prior to the administration of the vaccine, (2) the vaccinee's current condition, and (3) that the vaccinee's current condition constitutes a "significant aggravation" of the condition prior to the vaccination. *W.C.*, 704 F.3d at 1357.

For both Table and Non-Table claims, Vaccine Program petitioners must establish their claim by a "preponderance of the evidence." § 300aa-13(a).  That is, a petitioner must present evidence sufficient to show "that the existence of a fact is more probable than its nonexistence."  *Moberly*, 592 F.3d at 1322 n.2.  Proof of medical certainty is not required.  *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 872-73 (Fed. Cir. 1991).  However, a petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician.  § 300aa-13(a)(1).  Once a petitioner has established their *prima facie* case, the burden then shifts to respondent to prove, also by preponderant evidence, that the alleged injury was caused by a factor unrelated to vaccination.  *Althen*, 418 F.3d at 1278 (citations omitted); § 300aa-13(a)(1)(B).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded."  Vaccine Rule 3(b)(1).  Special masters must ensure each party has had a "full and fair opportunity" to develop the record.  Vaccine Rule 3(b)(2).  However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case.  Vaccine Rule 8(a); Vaccine Rule 8(d).  Special masters are not bound by

common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties.  Vaccine Rule 8(b)(1).

## II.        Procedural History

Based on the allegations of the petition, this case was initially assigned to the Chief Special Master as part of the Special Processing Unit ("SPU").  (ECF Nos. 17-18.) After petitioner filed an affidavit (Ex. 1) and medical records (Exs. 2-16), respondent filed his Rule 4 Report in May of 2022 (ECF No. 36).  In addition to disputing that petitioner had demonstrated either a Table SIRVA or a shoulder injury caused-in-fact by his vaccination, respondent contended that petitioner had not satisfied the Vaccine Act's severity requirement.  (*Id*. at 6-9; *see also* § 300aa-11(c)(1)(D) (requiring in pertinent part that residual effects or complications of the alleged injury persist for at least six months).)

Thereafter, petitioner filed additional medical records (Exs. 17, 20-21), photographs (Exs. 18-19), and an affidavit (Ex. 22).  (ECF Nos. 38-40, 42.)  He then filed an expert report supporting his claim.  (ECF No. 43; Exs. 23-40.)  Petitioner's expert, orthopedic surgeon Uma Srikumaran, M.D., sought to support both a Table injury of SIRVA and, alternatively, a shoulder injury caused-in-fact by vaccination.  (Ex. 23.)  Respondent filed a responsive report by orthopedic surgeon Paul Cagle, M.D. (ECF Nos. 46-47; Exs. A-B.)

The Chief Special Master then issued findings of fact and conclusions of law dismissing petitioner's Table SIRVA claim.  (ECF No. 48; 2023 WL 7128178 (Fed. Cl. Spec. Mstr. Sep. 27, 2023).)  However, the Chief Special Master did not reach the question of whether petitioner had satisfied the statutory severity requirement and further advised that a claim that petitioner suffered either a shoulder injury caused-in-fact by vaccination or significantly aggravated by vaccination remained to be litigated. (*Id*.)  The case was reassigned to the undersigned for this further litigation in February of 2024.  (ECF Nos. 51-52.)

After the case was reassigned, petitioner filed additional medical records (Exs. 41-44) and a third affidavit (Ex. 45).  (ECF Nos. 55-58.)  Respondent was then permitted an opportunity to have his expert address the severity requirement.  (ECF No. 64; Ex. B.[4])  Petitioner then filed a responsive report by Dr. Srikumaran.  (ECF No. 65; Exs. 46-48.)

Petitioner filed a motion for a ruling on the written record on January 29, 2025, which was fully briefed as of March 24, 2025.  (ECF Nos. 67-68, 70.)  I have determined that the parties have had a full and fair opportunity to develop the record and that it is appropriate to rule on the existing record.  *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *Kreizenbeck v. Sec'y of Health & Human Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020)

---

[4] When filing Dr. Cagle's supplemental report, respondent duplicated his use of the exhibit designation "B," which had previously been used for Dr. Cagle's curriculum vitae.  Accordingly, this decision will reference Dr. Cagle's supplemental report by its ECF No.

(noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").  Accordingly, petitioner's motion is now ripe for resolution.

### III.    Summary of Record Evidence

Petitioner received the vaccination at issue in his left shoulder on October 26, 2019, at eighty years of age.  (Ex. 11, p. 3; Ex. 1, p. 1.)  He had a prior history of a left-side rotator cuff repair in 2009, for which records are not available.  (Ex. 1, p. 1; Ex. 16, p. 10.)  Petitioner avers that his surgery resolved his pain and that he was asymptomatic at the time of his vaccination.  (Ex. 1, p. 1; Ex. 22, p. 2.)

Three weeks after that vaccination, on November 15, 2019, petitioner presented to his primary care provider ("PCP"), Stony Brook Medicine, for, *inter alia*, left shoulder pain.  (Ex. 7, p. 4.)  At that time, he reported that "[a]bout 24-48 hours after the shot, [he] began to feel muscular pain alongside radiating pain down to the mid bicep with abrupt, upward movement."  (*Id*.)  A physical exam showed intact active range of motion, but mild pain with palpation and movement with flexion and abduction.  (*Id*. at 10.)  An MRI was ordered for further diagnostic evaluation.  (*Id*. at 11.)  That MRI, conducted on November 20, 2019, showed the following by the radiologist's impression: "[s]equela of previous rotator cuff repair with decrease in marrow edema and mild fluid along the screw compared to prior MRI [of May 19, 2009[5]];"[n]o definitive full-thickness or high-grade partial rotator cuff tear;" and "[v]ery mild edema in the subcutaneous tissues later to left shoulder."  (Ex. 5, p. 11.)  Trace fluid in the subacromial subdeltoid bursa was also observed.  (*Id*.)

Petitioner returned to his PCP about a month later.  (Ex. 4, p. 2.)  The history reads in pertinent part:

> 80-year-old male complaining of left shoulder pain for about 1-1/2 months.  States he had the flu vaccine injection and then developed pain 2 days after.  While he was playing golf he felt soreness in his upper shoulder and has since not gone away.  She was concerned because he has a history of rotator cuff repair.  He was told he could have a Shoulder Injury Related to Vaccine Administration (SIRVA) disease. He denies any neck pain or significant injury numbness or tingling

(*Id*.)  Physical exam showed that the left shoulder was tender to palpation laterally at the bicep tendon with mild tenderness in the bicep groove, range of motion was 0-170 with internal rotation to L2, which was the same as his right shoulder, but with trace resistance on external rotation.  Petitioner had full strength and was negative for impingement signs.  He had "trace" findings on speed's testing (which tests for biceps pathology).  (*Id*.)  The MRI was interpreted as showing intact hardware from the prior rotator cuff repair, but with mild tendinitis and subcutaneous edema.  (*Id*.)  The

---

[5] The radiology report actually states that the study was compared to a study from May 19, 2019.  (Ex. 5, p. 10.)  However, petitioner has demonstrated that this is a likely typographic error.  (ECF No. 59; Ex. 44.)  This occurred subsequent to the prior finding of fact, which notes the fact of the purported May 19, 2019 MRI.  (ECF No. 48, p. 3, n. 6 (citing Ex. 5, p. 10).)

assessment was "left shoulder post injection edema [and] rotator cuff and biceps tendinitis without tear." (*Id*.)  Physical therapy was recommended, but petitioner was cleared to continue playing golf.  (*Id*.)

Thereafter, petitioner attended 24 physical therapy sessions from December 31, 2019, through March 2020.  (Ex. 6, pp. 15-79.)  At the initial evaluation, petitioner described his shoulder pain as dull and achy, rating it as between a 3 and 6 on a ten-point scale, and also described having difficulty reaching overhead, as well as dressing and showering.  (*Id*. at 76.)  On exam, petitioner had reduced strength and active range of motion in his left shoulder as compared to his right shoulder and painful end feel with passive range of motion; however, speed's test and several rotator cuff tests (empty can, subscapularis lift off, and drop arm) were all negative.  (*Id*. at 77-78.)  By March 10, 2020, petitioner was reporting that his pain had improved.  He explained that it was less severe, now 3 out of 10 at worst, and less frequent; however, it was still "annoying" and subject to sharp stabs or twinges with reaching.  (*Id*. at 15.)  Additional physical therapy was recommended.  (*Id*. at 16.)  However, petitioner averred that he stopped attending physical therapy at that time due to the Covid-19 pandemic.  (Ex. 22, p. 3.)

Although petitioner sought care for other reasons from both his orthopedist (Ex. 15, pp. 14-24) and primary care provider (Ex. 7, pp. 15, 18; Ex. 12, pp. 4-7) from April through September of 2020, he did not return for any care of his left shoulder until November of 2020 (Ex. 41, pp. 20-27).  When petitioner returned for care on November 12, 2020, he reported the following:

1. upper back
   81 year old male complaining of left upper back pain for 2 weeks. states he noticed the pain while driving with his left arm on the steering wheel. Pain was felt in between his spine and shoulder blade, pain radiated up into the neck. Pain only lasted a few minutes, he now had pain intermittently with certain movements. He is doing his home exercises for his shoulder and has improved since last December. He denies numbness tingling, neck pain.

(*Id*. at 20.)  On physical exam, he had tenderness to palpation at the medial border of the scapula, but was able to hug and shrug.  (*Id*.)  He also had mild scapular winging, but had full strength and full and pain free range of motion.  (*Id*.)  He was diagnosed with left shoulder scapulothoracic bursitis, and physical therapy was recommended.  (*Id*. at 20, 25.)  However, an addendum to the medical record of the same date documents that petitioner then called back to explain that he was also experiencing pain at the front of the shoulder.  (*Id*. at 27.)  The orthopedist advised that he may also have tendinitis and to maintain the plan for physical therapy.  (*Id*.)

Petitioner then returned to physical therapy on November 20, 2020.  (Ex. 13, pp. 14-17.)  His chief complaint was "L side shoulder blade and neck pain with reaching forward or [prolonged] driving."  (*Id*. at 14.)  He attended three more physical therapy sessions between November and December of 2020.  (*Id*. at 4-19.)  This was documented as a continuation of his prior physical therapy.  (*Id*.)  Petitioner averred that, during the period from March of 2020 through November of 2020, he restricted his

6

medical care only to necessary evaluations.  "My shoulder was not a topic of discussion because I had a home exercise I was already doing . . . ."  (Ex. 22, p. 3.)

As of a PCP visit of June 9, 2022, it was recorded that petitioner is an

83 year old male complaining of chronic left shoulder pain. patient still believe his pain started after receiving flu vaccine in 2019. he has been doing therapy, he has pain with certain movements overhead. he cannot play golf anymore.

(Ex. 41, p. 11.)  A new x-ray showed mild acromioclavicular and glenohumeral degenerative changes.  (*Id.* at 11, 19.)  He was assessed with chronic left shoulder pain.  (*Id*. at 18.)

a. Expert Opinions

Petitioner presented an expert opinion by orthopedic surgeon Uma Srikumaran, M.D.[6]  (Ex. 23.)  In his initial report, Dr. Srikumaran stressed based on his review of the evidence that, despite having had a prior rotator cuff repair, petitioner's condition was "dormant and stable" prior to vaccination.  (*Id.* at 4.)  Further, he does not believe there are any medical records that call into question petitioner's assertion that he experienced onset of left shoulder pain within 48 hours of the vaccination at issue, and he further emphasized that the treating orthopedist assessed "post injection edema."  (*Id*.)

Dr. Srikumaran cites a body of literature (which has also been filed in many other cases) for the proposition that vaccine antigen injected into the synovial tissue has the potential to induce a prolonged inflammatory reaction and that this can affect pathology of the subacromial space, as well as the biceps tendon and glenohumeral joint, resulting in damage such as bursitis, tendinitis, capsulitis, or bone erosion.  (Ex. 23, pp. 6-7.)  Thus, he opined:

---

[6] Dr. Srikumaran received his medical degree from Johns Hopkins University School of Medicine, where he was trained in orthopaedic surgery.  (Ex. 23, p. 1.)  Thereafter, Dr. Srikumaran received specialty training as a shoulder specialist at Harvard.  (*Id.*)  Dr. Srikumaran is board certified in orthopaedic surgery, and he maintains an active medical license in Maryland.  (*Id.*)  He has been on the faculty in the Department of Orthopaedic Surgery at Johns Hopkins School of Medicine since 2011.  (*Id.*)  He currently maintains a position as an Associate Professor in the Shoulder Division at Johns Hopkins University School of Medicine, as well as the Shoulder Fellowship Director and Chair of Orthopaedic Surgery for the Howard County General Hospital.  (*Id.*)  In his clinical capacity, Dr. Srikumaran has treated approximately 10-12 patients with shoulder dysfunction following vaccination in the last five years.  (*Id.*)  In his research capacity, Dr. Srikumaran has authored several publications in the field of shoulder surgery, including two articles specifically discussing SIRVA.  (*Id.*)

> The logical sequence of cause and effect established from the medical theory, for Mr. French suggests the needle injection of vaccine antigen inadvertently near the bursa or rotator cuff tendon led to a strong immune mediated inflammatory reaction, causing bursitis, rotator cuff and biceps tendinitis, and loss of range of motion in his case. The proximate temporal relationship is consistently reported by the petitioner in the medical records as discussed above. This timing supports a causation with the vaccination as the trigger. The petitioner's previous shoulder condition was entirely asymptomatic prior to vaccination, establishing his general state of shoulder health prior to vaccination administration. His current condition is well documented in the medical records.

(*Id*. at 7.)

Although petitioner's condition improved with physical therapy, Dr. Srikumaran accepted that petitioner continued to manage his condition with his at home exercise program.  (Ex. 23, pp. 4-5.)  Furthermore, Dr. Srikumaran opined that petitioner's re-initiation of physical therapy was directly related to his prior injury.  (*Id*. at 5.)  Although he described his injury differently in November of 2020, Dr. Srikumaran opined that this is consistent with the natural progression that SIRVA can take.  (*Id*.)

Respondent's expert, orthopedic surgeon Paul Cagle, M.D.,[7] disagreed that petitioner's vaccination can be so implicated.  (Ex. A.) He stressed that surgery is reserved for more severe and refractory cases of rotator cuff tearing and, therefore, "[t]he evidence of a prior repair in this case demonstrates that [petitioner] has a clear history of a prior significant rotator cuff tear." (*Id*. at 3.)  Given that, he opined that a simple recurrence of petitioner's rotator cuff condition represents a "viable" cause of his reported pain.  (*Id*.)  Moreover, because there are no available range of motion findings from prior to vaccination, it is possible that petitioner's documented 10-degree reduction in range of motion, which is not very significant, was his existing state following the prior rotator cuff repair.  (*Id*. at 4.)  Dr. Cagle does not appear to have challenged the theory underlying SIRVA, but opined that its application in this case is not supported by any evidence in the medical records to suggest a specific immune mediated response.  (*Id*.)  He opined that "there would need to be evidence separating any impact of the vaccination from any pre-existing shoulder pain.  This evidence simply is not demonstrated in this case." (*Id*.)  Dr. Cagle contended that "[t]here is simply no evidence that the pain or loss of range of motion wasn't already present." (*Id*. at 5.)

---

[7] Dr. Cagle received his medical degree from Loyola University Chicago Stritch School of Medicine in 2008, before going on to complete a residency in orthopaedic surgery at the University of Minnesota Academic Health Center and Medical School in 2013, followed by two shoulder fellowships: one at Mount Sanai Hospital in New York and another at Private Hospital Jean Mermoz/Centre Orthopaedic Santy in France.  (Ex. B, p. 1.)  From there, Dr. Cagle accepted a position as an Assistant Professor and the Interim Chair of the Department of Orthopaedic Surgery at Southern Illinois University School of Medicine. (*Id*.)  In 2016, he was elevated to Associate Professor and Associate Program Director in the Leni & Peter May Department of Orthopedics at the Icahn School of Medicine at Mount Sinai in New York.  (*Id*.; Ex. A, pp. 1-2.)  Dr. Cagle is board certified in orthopaedic surgery, and his clinical practice focuses on the shoulder, representing approximately 95% of the patients and pathology that he treats.  (Ex. B, p. 1; Ex. A, p. 2.)  He has also authored several publications and participated in several presentations. (*Id*.; Ex. B, pp. 3-15.)

Moreover, Dr. Cagle opined that petitioner's April 17, 2020 encounter for left upper back pain documented that petitioner had full and pain free range of motion of the shoulder and that his complaints as of that point were due to scapulothoracic bursitis, which is not a condition of the shoulder.  (ECF No. 64-1, pp. 2-3 (citing Ex. 41, p. 20).)  Thus, petitioner's shoulder pain resolved within six months of vaccination.  (*Id.*)  (Importantly, however, Dr. Cagle misread the medical record.  The date of this visit was November 12, 2020, rather than April 17, 2020.  (Ex. 41, p. 20.))

Responding to Dr. Cagle, Dr. Srikumaran explained that "[t]here can be many triggers to inflammation that cause a condition to become symptomatic.  However, in this case we have a trigger with a strong, reliably and consistently reported, temporal association."  (Ex. 46, p. 1.)  Moreover, Dr. Srikumaran noted that the treating orthopedist opined after review of petitioner's MRI that he was suffering "post injection edema," rather than correlating the symptoms to his prior surgery.  (*Id*. at 2.)  Dr. Srikumaran opined that petitioner's

> initial complaints and physical exam findings were consistent with biceps tendinitis and subacromial impingement syndrome with some loss of range of motion.  As time went on, it became apparent that stiffness progressed.  As range of motion suffered, different parts of the kinetic chain were stressed and caused pain in the shoulder blade and neck.

(*Id.*)

## IV.   Discussion

### a.  Table SIRVA

Generally, special masters may change or revisit any ruling until judgment enters, even if the case has been transferred.  *See McGowan v. Sec'y of Health & Human Servs.*, 31 Fed. Cl. 734, 737-38 (1994).  In most cases, however, a judicial officer such as a special master departs from previously decided issues only in the event of "new evidence, supervening law, or a clearly erroneous decision."  *Id.* at 737; *see also Sullivan v. Sec'y of Health & Human Servs.*, No. 10-398V, 2015 WL 1404957, at *20 n.36 (Fed. Cl. Spec. Mstr. Feb. 13, 2015).  Thus, petitioners should not expect that the Chief Special Master's findings in SPU cases will be revisited simply as a result of reassignment to another special master.  *E.g.*, *Kuczarski v. Sec'y of Health & Human Servs.*, No. 20-312V, 2023 WL 8713719, at *6 (Fed. Cl. Spec. Mstr. Nov. 17, 2023) (explaining that "as long as a case continues to be litigated there is always a possibility that further record development will necessitate revisiting a prior finding based on newly discovered evidence.  However, petitioners should not view reassignment of a case out of the SPU as a second bite at the apple regarding what has already been decided"); *Molina v. Sec'y of Health & Human Servs.*, No. 20-845V, 2024 WL 4223393, at *8-9 (Fed. Cl. Spec. Mstr. Aug. 15, 2024) (maintaining the Chief Special Master's findings as to petitioner's alleged Table injury claim).  *But see Pitts v. Sec'y of Health & Human*

9

*Servs.*, No. 18-1512V, 2023 WL 2770943, at *8-9 (Fed. Cl. Spec. Mstr. Apr. 4, 2023) (revisiting a fact finding from the SPU in significant part due to a change in law).

In this case, petitioner has not argued that the Chief Special Master's finding of fact dismissing the Table SIRVA claim should be revisited. However, I note in the interest of completeness that I have considered whether the evidence filed subsequent to that finding of fact would warrant re-evaluation of petitioner's Table SIRVA claim. I find that it does not, and I adopt the Chief Special Master's finding and analysis of petitioner's Table claim as my own. Of note, however, the Chief Special Master explained that it is the nature of the SIRVA QAI that evidence of a prior or alternative condition need only be significant enough to "muddy" the findings necessary to implicate the vaccine under the Table criteria. (ECF No. 48, p. 9.) Accordingly, he explained that the dismissal of the Table injury is not dispositive of whether either a cause-in-fact or significant aggravation claim is viable. (*Id.*)

### b. Causation-in-Fact/Significant Aggravation

#### i. *Loving* prongs 1-3

Because the basis for dismissal of the Table claim is potentially suggestive of a significant aggravation framework, and because the parties briefed both causation-in-fact and significant aggravation, I will briefly delineate my findings of fact under the first three *Loving* prongs to explain why this case is better addressed as a new injury caused-in-fact by vaccination.

- Prior to vaccination (*Loving* prong one), petitioner had a remote history of a prior rotator cuff repair surgery from about ten years prior. Petitioner avers that his surgery was successful and that he was pain free at the time of vaccination. Nothing in the medical records calls this into question. Accordingly, while petitioner did have a history of dysfunction that could potentially explain his later presentation (*contra* Table SIRVA QAI (i) and (iv)), Dr. Srikumaran is persuasive in opining that petitioner's condition prior to vaccination can be characterized as "dormant." However, while petitioner was pain free, there is no record evidence documenting the extent of his range of motion prior to vaccination.

- After vaccination (*Loving* prong two), petitioner presented with a new onset of left shoulder pain and mildly reduced range of motion. However, it is unclear how this mild reduction in range of motion would compare to his prior state. Petitioner's treating physician interpreted his MRI as showing intact hardware from the prior rotator cuff repair, but with mild tendinitis and subcutaneous edema. (Ex. 4, p. 2.) The assessment was "left shoulder post injection edema [and] rotator cuff and biceps tendinitis without tear." (*Id.*) Petitioner's orthopedist would later remark that petitioner's pain presentation in November of 2020 likely represented continued tendinitis. (Ex. 41, p. 27.)

- There is no medical opinion documented in the medical records indicating that petitioner's diagnosed tendinitis and edema were sequela of his prior rotator cuff repair.  At best, the radiologist's impression is ambiguous with regard to such a connection, having noted, among other findings, "[s]equela of previous rotator cuff repair with decrease in marrow edema and mild fluid along the screw."  (Ex. 5, p. 11.)  However, as noted above, the treating physician diagnosed biceps tendinitis and post-injection edema without referencing the prior shoulder surgery and while remarking that the repair hardware remained intact.  (Ex. 4, p. 2.)  Petitioner's expert, Dr. Srikumaran, likewise invoked a direct causal relationship between petitioner's vaccination and biceps tendinitis.  (Ex. 23, p. 7.)  Only respondent's expert, Dr. Cagle, supports a role for petitioner's prior shoulder surgery in explaining his post-vaccination presentation.  (Ex. A.)  However, Dr. Cagle's opinion is not persuasive in that he merely relies on the fact of the prior shoulder surgery, as well as the notion that repaired rotator cuffs can potentially become symptomatic again.  (*Id.* at 3.)  Dr. Cagle's opinion is insufficient to preponderantly establish that petitioner's post-vaccination presentation is a worsening of the pre-existing, otherwise dormant, condition (*i.e.*, the repaired rotator cuff).  Accordingly, this is not a case of significant aggravation (*Loving* prong three).

    ii.  *Althen* test

As explained above, in a cause-in-fact context petitioner must meet the three-part *Althen* test by demonstrating: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury in order to prove causation-in-fact.  *Althen,* 418 F.3d at 1278.

Under *Althen* prong one, petitioner's theory must be "reputable," though it need only be "legally probable, not medically or scientifically certain."  *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355-56 (Fed. Cir. 2006) (quoting *Pafford v. Sec'y of Health & Human Servs.*, No. 01-0165V, 2004 WL 1717359, at *4 (Fed. Cl. Spec. Mstr. July 16, 2004), *mot. for rev. denied*, 64 Fed. Cl. 19 (2005), *aff'd,* 451 F.3d 1352 (Fed. Cir. 2006)); *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548-49 (Fed. Cir. 1994).  Petitioner may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory.  *See Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1325-26 (Fed. Cir. 2006)).  However, "[a] petitioner must provide a 'reputable medical or scientific explanation' for [the proposed causal] theory," which must be "sound and reliable."  *Boatmon v. Sec'y of Health & Human Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019) (citation omitted) (first quoting *Moberly v. Sec'y of Health &*

11

*Human Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010); then quoting *Knudsen*, 35 F.3d at 548-49).

In this case, respondent argues that petitioner's theory of causation is too generic. (ECF No. 68, p. 11.) Respondent contends that "petitioner points out several publications regarding the medical theory of how a vaccination can cause a shoulder injury, and then suggests an immune mediated reaction. The assertion is conclusory and does not meet petitioner's burden of proof under *Althen*." (*Id*. (citing ECF No. 67, pp. 6-8).) However, while it may be true that petitioner's motion resorted to a broad description of the relevant literature, this criticism cannot reasonably be carried over to Dr. Srikumaran's opinion. Dr. Srikumaran reasonably explained that vaccination into the subacromial bursa can lead to a prolonged and robust inflammatory reaction that can affect, *inter alia*, the biceps tendon. (Ex. 23, p. 6.) Thus, he specifically applied the relevant literature to biceps tendinitis, the specific condition with which petitioner was diagnosed. (*Id*. at 7.) This explanation is supported by literature filed in this case. (S. Atanasoff et al., *Shoulder Injury Related to Vaccine Administration (SIRVA)*, 28 VACCINE 8049 (2010) (Ex. 24); Marko Bodor & Enoch Montalvo, *Vaccination-Related Shoulder Dysfunction*, 25 VACCINE 585 (2007) (Ex. 27).) And this type of opinion, based on the same literature, has been previously accepted in the cause-in-fact context.[8] Moreover, while Dr. Cagle does challenge the applicability of petitioner's theory to the instant case, he does not challenge the theory itself as a matter of general causation. Thus, petitioner has met his burden of proof under *Althen* prong one.

With general causation established, petitioner must also present evidence that the vaccine in question "did" cause petitioner's injury. This is assessed under the second and third *Althen* prongs. The third prong asks whether the timing of injury in this specific case aligns with what would be expected under the general theory presented under *Althen* prong one. *Pafford*, 451 F.3d at 1358. In this case, respondent does not dispute that petitioner has met his burden of proof under *Althen* prong three. (ECF No. 68, p. 12, n. 6.) The second *Althen* prong requires preponderant proof of a logical sequence of cause and effect, which is usually supported by facts derived from

---

[8] *See Morris v. Sec'y of Health & Human Servs.*, No. 19-1570V, 2023 WL 5092691, at *6 (Fed. Cl. Spec. Mstr. July 11, 2023) (explaining of the Atanasoff and Bodor publications that "[r]egardless of respondent's argument that the broader SIRVA concept is a creature of his own rulemaking, respondent cannot reasonably argue that these studies which he had already himself specifically endorsed are not persuasive as support for a medical theory of causation"); *see also A.P. v. Sec'y of Health & Human Servs.*, No. 17-784V, 2022 WL 275785, at *26-27 (Fed. Cl. Spec. Mstr. Jan. 31, 2022) (Special Master Gowen concluding that petitioner had presented a reputable scientific theory for how the MMR vaccine can cause shoulder pain and dysfunction and noting that "[b]oth the Atanasoff and Bodor articles support a causal association between vaccination and shoulder dysfunction"); *Lesher v. Sec'y of Health & Human Servs.*, No. 17-1076V, 2020 WL 4522381, at *11-12 (Fed. Cl. Spec. Mstr. July 2, 2020) (Chief Special Master Corcoran relying on the Atanasoff and Bodor articles in concluding that the evidence "comprises preponderant evidence sufficient to show that the seasonal influenza vaccine, when administered intramuscularly but improperly injected in the synovial space, can cause an inflammatory response resulting in shoulder injury"); *Lucarelli v. Sec'y of Health & Human Servs.*, No. 16-1712V, 2019 WL 1220933, at *5-6 (Fed. Cl. Spec. Mstr. Feb. 4, 2019) (Special Master Dorsey relying on Atanasoff and Bodor articles in concluding that petitioner had preponderantly shown how vaccination can cause a robust local and immune inflammatory response leading to pain and reduced range of motion).

petitioner's medical records.[9]  *Althen*, 418 F.3d 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cl. Spec. Mstr. Feb. 25, 1992).  While the opinions of treating physicians are often favored, *Capizzano*, 440 F.3d at 1326, a petitioner may support a cause-in-fact claim through presentation of either medical records or an expert medical opinion.  *See* § 300aa-13(a).

The Federal Circuit has cautioned that the second *Althen* prong "is not without meaning," but has also indicated that satisfaction of *Althen* prongs one and three is probative with respect to *Althen* prong two.[10]  *Capizzano*, 440 F.3d at 1326-27. Nonetheless, temporal association alone is not enough to satisfy petitioner's burden of proof.  *See, e.g., Veryzer v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 344, 356 (2011) (explaining that "a temporal  relationship alone will not demonstrate the requisite causal link and that petitioner must posit a medical theory causally connecting [the] vaccine and injury"), *aff'd per curiam sub nom. Veryzer v. United States*, 475 F. App'x 765 (Fed. Cir. 2012); *A.Y. v. Sec'y of Health & Human Servs.*, 152 Fed. Cl. 588, 595 (2021); *Forrest v. Sec'y of Health & Human Servs.*, No. 10-032V, 2017 WL 4053241, at *18 (Fed. Cl. Spec. Mstr. Aug. 10, 2017); *Cozart v. Sec'y of Health & Human Servs.*, No. 00-590V, 2015 WL 6746616, at *18 (Fed. Cl. Spec. Mstr. Oct. 15, 2015), *mot. for rev. denied*, 126 Fed. Cl. 488 (2016); *Crosby v. Sec'y of Health & Human Servs.*, No. 08-799V, 2012 WL 13036266, at *37 (Fed. Cl. Spec. Mstr. June 20, 2012).

In this case, with *Althen* prongs one and three having been met, the treating physician's opinion that petitioner demonstrated "left shoulder post injection edema [and] rotator cuff and biceps tendinitis without tear" carries significant weight.  (Ex. 4, p. 2.)  The fact that this opinion may largely be based on temporality is not disqualifying.

---

[9] Medical records are generally viewed as trustworthy evidence.  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  These records are generally contemporaneous to the medical events and "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium."  *Id.*  However, medical records and/or statements of a treating physician's views do not *per se* bind the special master.  § 300aa-13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 745 n.67 (2009) (reasoning that "nothing . . . mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted").

[10] The *Capizzano* Court described the circumstances in which *Althen* prong two may be a stumbling block as follows:

> There may well be a circumstance where it is found that a vaccine *can* cause the injury at issue and where the injury was temporally proximate to the vaccination, but it is illogical to conclude that the injury was actually caused by the vaccine.  A claimant could satisfy the first and third prongs without satisfying the second prong when medical records and medical opinions do not suggest that the vaccine caused the injury, or where the probability of coincidence or another cause prevents the claimant from proving that the vaccine caused the injury by preponderant evidence.

440 F.3d at 1327.

*Capizzano*, 440 F.3d at 1326-27.  Moreover, that opinion is further supported by Dr. Srikumaran's more detailed explanation, which indicates that, pursuant to his theory of causation, a logical sequence of cause and effect exists whereby "the needle injection of vaccine antigen inadvertently near the bursa or rotator cuff tendon led to a strong immune mediated inflammatory reaction" ultimately leading to biceps tendinitis.  (Ex. 23, p. 7.)

I have also considered Dr. Cagle's competing assessment, which concludes that petitioner's prior rotator cuff repair is in itself a more likely cause of his pain.  (Ex. A; ECF No. 64-1.)  However, I find Dr. Cagle's opinion less persuasive for two significant reasons.  First, Dr. Cagle stresses that the fact of petitioner's prior surgery speaks to the severity of his prior rotator cuff tear (Ex. A, p. 3), but does not credibly grapple with the fact that petitioner reported the surgery to have relieved his pain.  Instead, Dr. Cagle incorrectly conflates the absence of evidence regarding petitioner's prior condition (*see id.* at 5 (noting "[t]here is simply no evidence that the pain or loss of range of motion wasn't already present")) with a confounding presence of preexisting pain (*see* ECF No. 64-1, p. 4 (contending Dr. Srikumaran's opinion is inadequate "in the setting of well-documented pre-existing shoulder pain")).  Second, and relatedly, even without doubting that rotator cuff symptoms can potentially reappear after a surgical repair, I agree with Dr. Srikumaran (Ex. 46, pp. 1-2) that Dr. Cagle has not adequately explained why petitioner's own clinical history is better explained as a consequence of his remote history of a prior surgical repair ten years prior, rather than the vaccination that respondent concedes occurred just prior to onset.  Apart from the fact of the preceding surgery, Dr. Cagle has not pointed to any specific factor that would affirmatively support petitioner's surgical repair as the underlying cause of his condition.  By contrast, and as noted above, the treating physician specifically remarked upon a post-injection edema while also noting that the repair hardware remained intact.  (Ex. 4, p. 2.)  In effect, Dr. Cagle's opinion was no more specific than to suggest that a prior rotator cuff repair is always the most likely explanation of shoulder pain manifesting later in life.

In light of all of the above, I find that petitioner has demonstrated that he suffered a left shoulder injury caused-in-fact by his October 26, 2019 flu vaccination.

### c. Severity Requirement

In order to state a claim for a vaccine-related injury under the Vaccine Act, a vaccinee must have either:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

§ 300aa-11(c)(1)(D).

14

Neither "residual effects" nor "complication" is defined within the Vaccine Act itself. *See* § 300aa-33. However, in *Wright v. Secretary of Health & Human Services*, the Federal Circuit described these terms as follows: "'Residual' suggests something remaining or left behind from a vaccine injury. An effect that is 'residual' or 'left behind' is one that never goes away or that recurs after the original illness." 22 F.4th 999, 1005 (Fed. Cir. 2022) (internal citation omitted). A "complication," however, is a "morbid process or event occurring during a disease which is not an essential part of the disease, although it may result from it." *Id.* at 1006 (quoting *Abbott v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 792, 794 (1993)).

> Read together, "residual effects" and "complications" appear to both refer to conditions within the patient, with "residual effects" focused on lingering signs, symptoms, or sequelae characteristic of the course of the original vaccine injury, and "complications" encompassing conditions that may not be "essential part[s] of the disease" or may be outside the ordinary progression of the vaccine injury.

*Id.* (alteration in original).

In *Kirby v. Secretary of Health & Human Services*, the Federal Circuit confirmed that it is not an error for a special master to find the severity requirement met where that finding is based on a collection of "plausible evidence." 997 F.3d 1378, 1381 (Fed. Cir. 2021). In that case, petitioner's medical records reflected active treatment of her condition for only a few months before she was released as having reached maximum medical improvement, though not entirely symptom free. *Id.* at 1380. Thereafter, the medical records were silent as to her alleged residual effects for the remaining duration of the six-month post-vaccination period. *Id.* However, petitioner testified that she continued a home exercise plan for more than a year. *Id.* at 1381. Her testimony was corroborated by documentation in the form of her retained home exercise sheet, a more remote return visit where the relevant symptoms were again reported, and an expert opinion confirming her reported symptoms were consistent with her injury. *Id.* The Federal Circuit concluded that where the medical records are silent, rather than contradictory, it was not error for the special master to credit the petitioner's corroborated testimony as evidence satisfying the six-month severity requirement. *Id.* at 1383-84.

In this case, with onset of shoulder pain having occurred in late October of 2019, petitioner must demonstrate that the effects of his vaccine injury persisted until late May of 2020. Yet, he discontinued physical therapy on March 10, 2020, about four and a half months post-vaccination. (Ex. 6, pp. 15-16.) Importantly, however, petitioner reasonably explains that the Covid-19 pandemic factored into his treatment-seeking, even as it did not entirely prevent him from seeking care. (Ex. 22, p. 3.) This explanation has been credited in prior similar cases. *E.g.*, *Tackett v. Sec'y of Health & Human Servs.*, No. 20-1705V, 2023 WL 6995391, at *9 (Fed. Cl. Spec. Mstr. Sep. 25, 2023) (finding the severity requirement met where treatment stopped after five months and placing "significant weight on the disruptions caused by the Covid-19 pandemic as

the reason petitioner stopped attending physical therapy when he did"); *Patterson v. Sec'y of Health & Human Servs.*, No. 20-1919V, 2026 WL 473257, at *18 (Fed. Cl. Spec. Mstr. Jan. 21, 2026).  Moreover, petitioner's subsequent treatment record from November 12, 2020, confirms as of that date that petitioner was continuing his at home physical therapy exercise program.  (Ex. 41, p. 20.)

Additionally, petitioner's November 20, 2020 physical therapy records document his treatment from that period as a continuation of his prior physical therapy.  (Ex. 13, pp. 14-17.)  Dr. Srikumaran's opinion that petitioner's presentation from November of 2020 is potentially consistent with the evolution of a SIRVA is supported by the treating orthopedist's addendum explaining that petitioner's presentation likely included a continuation of his tendinitis in addition to his newly diagnosed scapulothoracic bursitis. (Ex. 41, p. 27.)  Dr. Cagle's competing opinion that the scapulothoracic bursitis diagnosis, and the physical exam leading to it, are dispositive of the severity requirement is not persuasive, because it was based on the incorrect assumption that the encounter occurred less than six months post-vaccination.  (ECF No. 64-1, pp. 2-3.)

Respondent stresses that petitioner otherwise sought treatment from his orthopedist on five occasions between July and September of 2020 without mentioning his shoulder pain.  (ECF No. 68, pp. 4-6 (citing Ex. 15, pp. 14-24).)  He cites *Watts v. Secretary of Health & Human Services*, No. 17-1494V, 2019 WL 4741748, at *7 (Fed. Cl. Spec. Mstr. Aug. 13, 2019), as instructive.  In that case, the petitioner entirely stopped seeking treatment for a period of two years and only returned to report further symptoms in connection with litigation.  *Watts*, 2019 WL 4741748, at *7.  However, *Watts* is clearly distinguishable, both because I find this petitioner's return to treatment to be credible and because the gap in treatment is much less lengthy.  Moreover, the gap in treatment can at least partly be explained by the pandemic.  And, notably, the orthopedic encounters respondent cites were for other specific purposes and included no documented examination of the upper extremities.  (Ex. 15, pp. 14-24.)

For these reasons, petitioner has preponderantly demonstrated that he suffered complications or residual effects of his vaccine-caused shoulder injury for more than six months.

## V.    Conclusion

After weighing the evidence, and considering the record as a whole, I find that petitioner has preponderantly demonstrated that he is entitled to compensation for a shoulder injury caused-in-fact by his October 26, 2019 flu vaccination.  A separate damages order will be issued.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master

16